UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH MERO,

        Plaintiff,

vs.

        Case No. 05-CV-73069
        HON. GEORGE CARAM STEEH

UNITED STATES FIGURE SKATING
ASSOCIATION,

        Defendant.

_____/

<u>OPINION AND ORDER
DENYING DEFENDANT'S MOTION FOR JUDICIAL NOTICE (no dkt #) AS MOOT;
OVERRULING DEFENDANT'S OBJECTIONS (no dkt #);
DENYING AS MOOT DEFENDANT'S MOTION TO STRIKE (#10)
UNDER CALIFORNIA ANTI-SLAPP STATUTE AND DISMISSING
PLAINTIFF'S CLAIM UNDER CALIFORNIA'S UBPA § 17200;
AND DENYING DEFENDANT'S MOTION TO DISMISS (#9)</u>

Defendant United States Figure Skating Association ("USFSA") moves to dismiss under Federal Rule of Civil Procedure 12(b)(6), or to strike under California's Anti-SLAPP[1] statute California Civil Procedure Code § 425.16, plaintiff Joseph Mero's claims of libel, false light, tortious interference with prospective business advantage, tortious interference with existing economic advantage, intentional infliction of emotional distress, and violation of California's Unfair Business Practices Act, California Business and Professional Code ("UBPA"), §17200, et seq.. USFSA also moves for judicial notice of USFSA By-Laws and a grievance hearing transcript, and objects to plaintiff's submission of evidence. A hearing on the motions was held on November 2, 2005, after which the parties were directed to file supplemental briefs. The court is in receipt of the supplemental briefs, and the motions are

---

[1] The acronym "SLAPP" refers to "Strategic Lawsuit Against Public Participation."

now ripe for review.

## I. Background

This lawsuit originated in the United Stated District Court for the Central District of California, with plaintiff Joseph Mero filing an Amended Complaint there on June 7, 2005. The instant motions, and plaintiff's "Evidence Packet," were also filed in the California Federal District Court before USFSA's motion to transfer venue under 28 U.S.C. § 1404(a) was granted on July 26, 2005. The transferred record was received and entered here on August 10, 2005.

Plaintiff Joseph Mero is a figure skating coach and member of defendant USFSA, a private non-profit governing body. Under USFSA By-Laws, a member may file a grievance against another member for violating USFSA Rules or By-Laws. USFSA grievance decisions affecting a member's participation in a "protected athletic event" such as the Olympics are subject to arbitration.

A "First Grievance" was filed by the mother of a 15-year old skating student in 2003 against plaintiff and his now ex-wife and skating coach Jackie Mero based in part on Jackie's alleged affair with 18-year old skating student Ben Woolwine. The Meros, Woolwine, and the 15-year old student all lived in the same Michigan home, a common practice among young skaters and their coaches. Following a USFSA grievance hearing, Jackie Mero was banned from the USFSA for life. Plaintiff Joseph Mero received a one-year suspension through October 17, 2004, apparently for not timely reporting the alleged affair to USFSA.

A "Second Grievance" was filed against plaintiff on September 17, 2003 by Woolwine. USFSA Ethics Chair Patricia St. Peter sent notice of the "Second Grievance" to the attorney who represented plaintiff with respect to the "First Grievance," Daniel Hunter. Hunter was asked to forward the "Second Grievance" to plaintiff. Hunter allegedly

received it on October 17, 2003, but did not forward it to plaintiff. As a result, a response to the "Second Grievance" was not filed within 30 days and the allegations were deemed admitted and plaintiff's rights to a hearing and/or an appeal were waived by operation of USFSA Ethics Committee Rules 3.08 and 3.09. Almost a year later, on September 28, 2004, plaintiff received a letter from USFSA Grievance Chair Ann O'Keefe notifying him that he was suspended from USFSA membership for five years based on the default adjudication of the "Second Grievance."

On October 6 and 7, 2004, USFSA e-mailed Michigan USFSA skating clubs and members of plaintiff's five-year suspension. Meanwhile, on October 1 and 11, 2004, plaintiff's former attorney Hunter allegedly notified USFSA that he had not forwarded the "Second Grievance" to Mero. On October 22, 2004, USFSA's O'Keefe served Mero with requests as to his knowledge of the "Second Grievance." Plaintiff Mero allegedly responded to the requests on October 24, 2004, and sent separate October 27, 2004 complaints to USFSA about the e-mails. In November and December 2004, USFSA faxed lists of suspended or banned members to USFSA clubs. Mero alleges his name was included on the lists among other well known "child molesters."

On November 19, 2004, Mero's new counsel asked for a copy of the "Second Grievance" and demanded that the five year suspension be lifted. Upon receipt of a copy of the "Second Grievance," Mero filed a December 2, 2004 response. On December 10, 2004, Mero was notified by USFSA that a hearing would be held prior to the January 9, 2005 U.S. Figure Skating Championships, a "protected athletic event." A hearing was held on December 30, 2004, and on January 4, 2005, the five year suspension was lifted, and an indefinite suspension was imposed, to begin in March 2005, pending remedial measures to be taken by Mero at any time. Mero contacted USFSA in late January 2005 stating he had begun taking the remedial measures, and that they would be completed by June 2005.

On February 1, 2005, USFSA published on its website as "Top News," and in "SKATING" magazine, the results of Mero's December 30, 2004 hearing.

Mero's Amended Complaint alleges nine claims: Count I - libel based on the October 6, 2004 USFSA e-mail announcing Mero's five year suspension; Count II - libel based on the October 7, 2004 e-mail announcing Mero's five year suspension; Count III - libel based on the November and December 2004 list publications naming Mero as a suspended USFSA member; Count IV - libel based on publication of the December 30, 2004 hearing results and indefinite suspension on USFSA's website and in "SKATING" magazine; Count V - false light based on the alleged libels; Count VI - tortious interference with prospective business advantage based on the alleged libels; Count VII - tortious interference with existing economic advantage based on the alleged libels; Count VIII - intentional infliction of emotional distress; and Count IX - violation of California's UBPA.

## II.  USFSA's Motion for Judicial Notice and Objections to Plaintiff's Proffered "Evidence Pack"

USFSA asks the court to take "judicial notice" of its By-Laws and the "Second Grievance" hearing transcript to prevent the court from looking outside the pleadings and transforming its motion to dismiss into a motion for summary judgment.  "If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."  Fed. R. Civ. P. 12(c). Mero's Amended Complaint implicates the USFSA By-Laws and "Second Grievance," and expressly incorporates By-Law provisions.  Consequently, the By-Laws and "Second Grievance" hearing transcript are subject to consideration in adjudicating USFSA's Rule 12(b)(6) motion for dismissal without converting the motion to a Rule 56 motion for

4

summary judgment.  See Teagardener v. Republic-Franklin Inc. Pension Plan, 909 F.2d 947, 949-50 (6th Cir.1990).  USFSA's motion to take judicial notice is moot.

USFSA also objects to plaintiff's filing of an "Evidence Pack."  USFSA has moved to strike plaintiff's claims under California's Anti-SLAPP statute.  California Anti-SLAPP challenges may be brought in federal court under a "motion to strike" as long as the discovery limiting provisions of the statute are not applied in direct conflict with the Federal Rules of Civil Procedure.  See Verizon Delaware, Inc. v. Covad Communications Co., 377 F.3d 1081, 1091 (9th Cir. 2004) (recognizing the doctrine of Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)).  Dismissal under the Anti-SLAPP statute is appropriate if *either* the plaintiff presents an insufficient legal basis for his claims *or* "no evidence of sufficient substantiality exists to support a judgment for the plaintiff."  Metabolife International, Inc. v. Wornick, 264 F.3d 832, 840 (2001).  Mero properly proffered an "Evidence Pack" in defense of USFSA's Anti-SLAPP "motion to strike." The court simply may not consider the materials to the extent such would conflict with Rule 12(b)(6).  Verizon Delaware, 377 F.3d at 1091.  USFSA's objection is overruled.

### III. USFSA's Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a claim on an issue of law.  "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  In considering a Rule 12(b)(6) motion, a court must "accept all of plaintiff's factual allegations as true and determine whether any set of facts consistent with the allegations would entitle the plaintiff to relief."  G.M. Eng'r and Assoc., Inc. v. West Bloomfield Tp., 922 F.2d 328, 330 (6th Cir. 1990).

### A.  Choice of Law

5

Prior to a transfer of venue of this lawsuit from California, the parties' briefs relied upon California law to support their positions. At the November 2, 2005 hearing, plaintiff's Counsel took the position that Michigan law applies under a choice of law analysis, prompting the court to order the filing of supplemental briefs.

Venue was transferred here by the California Federal District Court "for the convenience of the parties and witnesses and in the interest of justice" under 18 U.S.C. § 1404(a). This court is obligated as the transferee court to apply the substantive state law that would have been applied if there had been no change of venue, including choice of law rules. See Martin v. Stokes, 623 F.2d 469, 471 (6th Cir. 1980) (citing Van Dusen v. Barrack, 376 U.S. 612 (1964)); Charter Oak Fire Ins. Co. v. Broan Nutone, LLC, 348 F.Supp.2d 934, 938 (W.D. Tenn. 2004) (citing Erie, 304 U.S. at 79; Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496 (1941); and Van Dusen, 376 U.S. at 632-37).

California choice of law rules apply a "governmental interest" analysis. Iszuzu Motors Limited v. Consumers Union of United States, Inc., 12 F.Supp.2d 1035, 1043 (C.D. Cal. 1998) (quoting Reich v. Purcell, 67 Cal.2d 551, 554, 63 Cal.Rptr. 31 (1967)).

> Courts applying California's governmental interests test have established a three-part test:
>
> > Under this amorphous and somewhat result-oriented approach, we must first consider whether the two states' laws actually differ; if so, we must examine each state's interest in applying its law to determine there is a "true conflict"; and if each state has a legitimate interest we must compare the impairment to each jurisdiction under the other's rule of law.
>
> Arno v. Club Med. Inc., 22 F.3d 1464, 1467 (9th Cir.1994); Page v. Something Weird Video, 908 F.Supp. 714, 716 (C.D.Cal.1995). Thus, there is no conflict if the same outcome would be reached under the laws of each of the states involved. Hurtado v. Superior Court, 11 Cal.3d 574, 580, 114 Cal.Rptr. 106, 522 P.2d 666 (1974). **Likewise, if only one state has an interest in the application of its laws, there is no "true conflict," and the law of the interested state is applied.** Id. If at least two states have a legitimate interest, however, the court must determine to what extent each state's interest would be impaired if a particular jurisdiction's law were

6

applied. Id. In applying this rule, "courts must consider the actual stake, as opposed to the hypothetical interest, that the potentially concerned states have in the litigation." Camp v. Forwarders Transp., Inc., 537 F.Supp. 636, 638 (C.D.Cal.1982) (citing Strassberg v. New England Mutual Life Insurance Co., 575 F.2d 1262, 1264 (9th Cir.1978)).

Iszuzu Motors, 12 F.Supp.2d at 1043 (emphasis added).

> Although the two potentially concerned states have different laws, there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied. (Comment, False Conflicts, 55 Cal.L.Rev. [74,] 77; Cavers, [The Choice of Law Process (1965)] pp. 89-90.) "When one of two states related to a case has a legitimate interest in the application of its law and policy and the other has none, there is no real problem; clearly the law of the interested state should be applied." (Currie, Selected Essays on Conflicts of Laws (1963) p. 189.)

Hurtado, 11 Cal.3d at 580 (footnote omitted). Stated succinctly, "[u]nder California choice of law rules, a court does not apply the law of a state that has no interest in seeing its law applied." Hite v. Tritron Energy Ltd., 35 Fed.Appx. 434, 438 (9th Cir. June 5, 2002) (footnote citing Hurtado omitted) (unpublished). See also In re Title U.S.A. Ins. Corp., 36 Cal.App.4th 363, 372, 42 Cal.Rptr.2d 498 (1995) (recognizing "[u]nder the governmental interest analysis [w]hen one of two states related to a case has a legitimate interest in the application of its law and policy and the other has none, there is no real problem; clearly the law of the interested state should be applied").

In Competitive Technologies v. Fujitsu Ltd., 286 F.Supp.2d 1118 (N.D.Cal. 2003), a California federal district court reasoned that California's Anti-SLAPP statue was inapplicable to a non-resident's tort counterclaims premised on a wrongful prosecution of an ITC proceeding in the District of Columbia:

> [I]f California choice of law rules are applied, the anti-SLAPP statute does not apply to Fujitsu's counterclaims. California follows the governmental interest approach to choice of law. Hurtado v. Superior Court, 11 Cal.3d 574, 579, 114 Cal.Rptr. 106, 522 P.2d 666 (1974). Under that approach, the court must analyze "the respective interests of the states involved ... the objective of which is 'to determine the law that most appropriately applies to the issue involved.' " Id. (quoting Reich v. Purcell, 67 Cal.2d 551, 554, 63 Cal.Rptr. 31, 432 P.2d 727 (1967)). In Hurtado, the court addressed whether or not a

7

Mexican law limiting damages could be applied to tort claims filed by Mexican citizens against California residents based on an injury that occurred in California. Id. at 578, 114 Cal.Rptr. 106, 522 P.2d 666. The court concluded that the Mexican law did not apply because Mexico had no interest in having its law applied under the facts of the case. Id. at 580-581, 114 Cal.Rptr. 106, 522 P.2d 666. The court explained its conclusion as follows:

> The interest of a state in a tort rule limiting damages for wrongful death is to protect defendants from excessive financial burdens or exaggerated claims.... [T]his interest to avoid the imposition of excessive financial burdens on (defendants) ... is also primarily local; that is, a state by enacting a limitation on damages is seeking to protect its residents from the imposition of these excessive financial burdens.... Since it is the plaintiffs and not the defendants who are the Mexican residents in this case, Mexico has no interest in applying its limitation of damages--Mexico has no defendant residents to protect and has no interest in denying full recovery to its residents injured by non-Mexican defendants.

Id. at 581, 114 Cal.Rptr. 106, 522 P.2d 666 (quotations and citations omitted).

Following Hurtado, **the court in Block v. First Blood Assoc., 691 F.Supp. 685 (S.D.N.Y.1988), reached a similar result. There, the court addressed whether the privilege under Cal. Civ.Code § 47 applied to defamation claims in an action that was filed in California and transferred to New York under § 1404(a), where the allegedly defamatory statements were made in a proceeding in New York. Id. at 687. The court applied California choice of law rules. Id. at 697. The court concluded that California privilege law did not apply, explaining its result as follows**:

> Under the circumstances here, New York, but not California, has an interest in applying its laws to the privilege issue. **The fulcrum of a privilege defense is the scope of protection to be afforded under a state's substantive law to otherwise defamatory publications**; the purpose of a common law or statutory privilege is the regulation of defamatory conduct that occurs within a state's borders. In this action, New York has a compelling interest in policing tortious conduct committed in New York, by a New York attorney, with reference to future or pending litigation in New York.

Id.

Here, as in Block and Hurtado, **California appears to have no governmental interest in having its law applied. In particular, neither UI nor Competitive are California residents. Nor did the tortious conduct**

8

> **or injury occur in California**. In fact, the only connection with California appears to be Fuijtsu's activities in Northern California. Thus, as the court held in Hurtado, because it is the plaintiffs rather than the defendants who reside in California, California has no governmental interest in having its privilege applied to Counterclaims Ten through Thirteen.

Competitive Technologies, 286 F.Supp.2d at 1158-59 (footnote omitted) (emphasis added).

In the case at bar, neither of the parties is alleged or argued to be a resident of California. Plaintiff Mero is a resident of Michigan. USFSA is alleged to be incorporated under Colorado law, with its principal place of business located in Colorado Springs, Colorado. Amended Complaint, ¶ 4, at 2. USFSA does not contest Mero's assertions that the alleged libelous statements did not originate in California, or that the "First Grievance" and "Second Grievance" proceedings were not conducted in California. See Plaintiff's December 18, 2005 Supplemental Brief, at 8 (quoting California District Court's August 8, 2005 Transfer Order). USFSA's arguments that there are twenty-three USFSA clubs in California and four top USFSA figure skaters training in California does not support applying California Anti-SLAPP statute and privilege law as neither the USFSA clubs nor skaters are defendants in this lawsuit in need of a privilege defense. USFSA's argument that Mero's current clients live and skate in California is likewise unavailing. California's Anti-SLAPP statute and absolute privilege defenses to claims of defamation are applied on the basis that "California has a great interest in determining how much protection to give California speakers[.]" CompetitiveTechnologies, 28 F.Supp.2d at 1158 (internal citation omitted). Any interest in protecting *Mero* from damages he may have suffered as a result of publications transmitted to California does not implicate California's interest in protecting California speakers.

California has simply no interest in applying its Anti-SLAPP and state law privileges in this lawsuit. Michigan has an unquestionable interest in this defamation lawsuit filed by a Michigan resident, in protecting both Mero's rights and USFSA's rights. Applying

9

California's "governmental interest" test, and finding that California has no interest in seeing its law applied, the court concludes that Michigan law is controlling. Hite, 35 Fed.Appx. at 438; Iszuzu Motors, 12 F.Supp.2d at 1043; Hurtaldo, 11 Cal.3d at 580; In re Title U.S.A., 36 Cal.App.4th at 372. It follows that USFSA's motion to strike filed pursuant to the California Anti-SLAPP statute will be denied as moot. Consistent with the finding that Michigan law applies, plaintiff Mero's claim under California's UBPA will be dismissed[2].

The court is not persuaded that Mero waived the application of Michigan law by failing to timely invoke Michigan law. See generally Sommer v. Gabor, 40 Cal.App.4th 1455, 1467-68, 48 Cal.Rptr.2d 235 (1995). Mero raised Michigan law at his first opportunity before this court in defending against USFSA's motion for dismissal; the California District Court transferred venue here before reaching the merits of USFSA's privilege defenses.

### B.  Michigan Privilege Defense

USFSA argues it is nonetheless entitled to dismissal under Michigan law pursuant to an absolute privilege applicable to quasi-judicial proceedings, including private grievance procedures subject to arbitration. Mero argues that USFSA's publications are subject to only a qualified privilege.

The Michigan Supreme Court has long limited the application of absolute privilege: "Our court recognizes the rule of absolute privilege, but it has repeatedly refused to extend its application beyond the necessities of the judicial, legislative, and military occasions." Timmins v. Bennett, 352 Mich. 355, 363, 89 N.W.2d 748 (1958) (quoting Raymond v. Croll, 233 Mich. 355, 363, 268 N.W.2d 748 (1925)). "Generally speaking, absolute privilege is confined to cases in which the public service or the administration of justice requires

---

[2] Mero concedes to the dismissal of his UBPA claim. See Plaintiff's December 18, 2005 Supplemental Brief, at 11 n.4.

complete immunity from being called to account for language used. It applies more directly to matters of public concern, such as language used in legislative, judicial and executive proceedings; and it is not intended so much for the protection of those engaged in the service, as it is for the promotion of the public welfare." Id. "An absolutely privileged communication is generally defined as one for which no remedy is provided for damages in a civil action for slander or libel because of the occasion on which it was made or uttered." Timmins, 352 Mich. at 363 (internal citation omitted). In contrast, qualified immunity permits recovery for slander or libel on proof of malice. Id. at 367. "A qualified privilege exists in cases where some communication is necessary and proper in the protection of a person's interest, but this privilege may be lost if the extent of its publication be excessive." Id. 371 (quoting Smith v. Smith, 73 Mich. 445, 41 N.W.2d 499, 500 (1889)). The Timmins court held that an attorney's letter to a police officer in contemplation of filing a lawsuit was subject to a qualified privilege as opposed to an absolute privilege because the letter was not part of any case in court or other judicial proceeding. Id. at 365.

Consistent with this narrow construction of the scope of the absolute privilege defense, the Michigan Court of Appeals extended only qualified immunity to a public school principal who allegedly defamed a school counselor in a memorandum recommending disciplinary action issued as part of the principal's duties under a collective bargaining agreement. Parks v. Johnson, 84 Mich.App. 162, 166, 168, 269 N.W.2d 514 (1978).

> In the case at bar defendant was not acting in any judicial or legislative capacity when she wrote the allegedly libelous memorandum. Her duty related solely to employment and supervision procedures within the school system. Since she was acting in her official capacity, she does have a qualified privilege, as do all public servants acting within the scope of their employment.

Id. at 168. Qualified immunity also applies to private employers. See Smith v. Fergen, 181 Mich. App. 594, 596-597, 269 N.W.2d 514 (1978). Applying qualified immunity to a private

11

employer's publication that the plaintiff-employee was discharged for stealing, the Michigan Supreme Court explained:

> The great underlying principle upon which the doctrine of privileged communications stands, is public policy. This is more especially the case with absolute privilege, where the interests and necessities of society require that the time and occasion of the publication or utterance, even though it be both false and malicious, shall protect the defamer from all liability to prosecution for the sake of the public good. It rests upon the same necessity that requires the individual to surrender his personal rights, and to suffer loss for the benefit of the common welfare. Happily for the citizen, this class of privilege is restricted to narrow and well-defined limits. Qualified privilege exists in a much larger number of cases. It extends to all communications made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty. And the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation.

Bacon v. Michigan Cent. R. Co., 66 Mich. 166, 170, 33 N.W. 181 (1887).

USFSA is a private non-profit organization. USFSA's relationship with Mero is analogous to an employment relationship in that Mero may be suspended from coaching skaters participating in USFSA in a manner similar to an employee being suspended or discharged from his employment. USFSA has suspended Jackie Mero for life from coaching skaters participating in USFSA sanctioned events. USFSA's suspension of Mero following a private "Second Grievance" proceeding does not fall within the narrow scope of a public judicial, legislative, or military proceeding. Timmins, 352 Mich. at 363. USFSA does not argue it owed a legal duty to communicate the results of Mero's suspension to other USFSA members or clubs. See Bacon, 66 Mich. at 170. Couch v. Schultz, 193 Mich. App. 292, 483 N.W.2d 684 (1992), holding that prison corrections officers enjoy an absolute privilege from liability for defamation actions filed by prisoners premised on the issuance of major misconduct reports, is distinguishable as involving a public function performed by state officers pursuant to legal obligations owing under Michigan's Correction Code, M.C.L. § 791.251 et. seq.. See also Shelly v. Johnson, 849 F.2d 228 (6th Cir. 1988) (holding that

Michigan corrections officers enjoy absolute judicial immunity from § 1983 liability consistent with the fact that a "Michigan prison hearing officer is an attorney especially appointed to conduct prison disciplinary hearings as a full time judicial officer" and "for all practical purposes is similar to that of an administrative law judge and as such should be entitled to absolute judicial immunity").  The court is not persuaded that USFSA grievance hearing officers act as state judges appointed by law.  The Michigan Supreme Court's holding in Fulgham v. United Parcel Service, 424 Mich. 89, 378 N.W.2d 472 (1985), that collective bargaining grievance findings of theft were entitled to complete deference and constituted a complete defense to the employees' claims of defamation, does not support USFSA's argument of an absolute privilege arising from quasi-judicial immunity.  Justice Levin's concurring opinion in Fulgham has not been shown to have been adopted by any Michigan court.

USFSA is entitled to a qualified privilege with respect to Mero's claims premised on defamatory publications.  Bacon, 66 Mich. at 170; Timmins, 352 Mich. at 363; Smith, 181 Mich. App. at 596-597.  Consequently, USFSA's motion to dismiss based on an absolute privilege will be denied as it remains possible for Mero to develop a set of facts overcoming USFSA's qualified privilege.  Conley, 355 U.S. at 45-46; G.M. Eng'r and Assoc., Inc., 922 F.2d at 330.

### III. Conclusion

For the reasons set forth above, USFSA's motion for judicial notice is hereby DENIED as MOOT.  USFSA's objections to Mero's submission of an "Evidence Pack" are hereby OVERRULED.  USFSA's motion to strike filed pursuant to California's Anti-SLAPP statute is hereby DENIED as MOOT.  Mero's claim of violation of California's UBPA, §17200, et seq, is hereby DISMISSED on Mero's stipulation and this court's finding that Michigan law is controlling. USFSA's motion to dismiss is hereby DENIED.  The parties will

be notified of a scheduling conference date under separate order.

    SO ORDERED.

                                  s/George Caram Steeh  
                                  GEORGE CARAM STEEH  
                                  UNITED STATES DISTRICT JUDGE

Dated: January 20, 2006

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on January 20, 2006, by electronic and/or ordinary mail.

                                  s/Josephine Chaffee  
                                  Secretary/Deputy Clerk